## Boston Mutual Life Insurance Company *v.* Power Manufacturing Company.

Opinion delivered October 13, 1930.

*Earl Bohannon* and *W. A. Leach,* for appellant.
*George C. Lewis,* for appellee.

Smith, J. In 1920 E. W. Langham purchased a Primm oil engine at a cost of $6,600, which was installed on his rice farm as a necessary part of a pumping plant required to grow rice. He borrowed money from the Deming Investment Company in 1922, with a portion of which he paid the balance of the purchase money then due on the engine, and he secured this loan by mortgages on his farm to the investment company, which the latter, on March 2, 1922, assigned to the Boston Mutual Life Insurance Company.

The engine was used for the purpose intended until 1923, when the engine house enclosing it was destroyed

by fire and the engine was so badly damaged that extensive and expensive repairs were necessary, and these were later made by the Power Manufacturing Company, the company which had made and sold the engine.

The agent representing the Power company took two notes covering the cost of the repairs, one for $162.50, due November 15, 1925, and the other for $1,184.80, due December 1, 1925. These notes were the form notes used by the Power Company in making sales and, after reciting the service rendered in repairing the engine, undertook to reserve the title thereto, as in the case of a sale, until the repairs had been paid for. It is conceded, of course, that the note did not effect this purpose, and that the engine, as a fixture, remained subject to the lien of the mortgages on the land upon which the engine had been installed. *Hachmeister* v. *Power Mfg. Co.*, 165 Ark. 469, 264 S. W. 976. No attempt had been made to enforce a mechanics' lien.

After this repair the engine was reduced from 100 to 80 H. P. capacity, but Langham continued to use it on his farm until October 7, 1927, at which time it was so badly worn through age and use that it was necessary to practically rebuild it, and this could be done only by returning it to the Power Company's factory in Marion, Ohio. On the date last mentioned, Langham entered into a written contract with the Power Company, which recited that the two notes given for the previous repairs had not been paid, and it was agreed that the Power Company should "take this engine and all equipment to the factory, rebuild it and offer it for sale," and that "From the sellng price the amount of the above two notes will be deducted plus the handling cost and cost of rebuilding it and refund to me the difference. In consideration of this, I agree to release to them the engine, they to do this hauling and stand all incidental expense."

It is not questioned that the effect of this agreement, which severed the fixture from the soil to which it was attached, was that of a conversion of the engine, and that

Langham had no right to make this contract, for the reason that the engine, as a fixture, was subject to the lien of the mortgages, and that therefore the Power Company is liable in conversion, and this is a suit by the owner of the mortgages on the land to recover the value of the engine at the time of its conversion. The court found the value of the engine at the time of its conversion to be $840, and rendered a decree accordingly, and the mortgagee has appealed, and now insists that the engine was of a greater value at the time of its conversion.

The parties agree that the only question in the case involved on this appeal is the value of the engine at the time and place of its conversion, and the testimony which we shall now review is of value only in so far as it elucidates that question. *Parks* v. *Thomas*, 138 Ark. 70, 210 S. W. 141.

The Power Company took the engine to its factory and practically rebuilt it, and there was offered in evidence an itemized statement of the expenses incurred. These included:

| | |
|---|---:|
| New parts | $1,792.75 |
| Factory labor | 323.93 |
| Freight and handling | 244.31 |
| Selling cost | 840.00 |
| Testing | 100.00 |
| Total | $3,300.99 |

The testimony shows these expense items are correct. The engine was sold, after being rebuilt, for $4,200. The item of $840, selling cost, is 20 per cent. of the sales price, which is shown to be the usual commission for making sales of machinery. These items total $3,300.99, which, when subtracted from the $4,200 sales price, leave a balance of $899.01. In addition, the old flywheel and other parts had a scrap value, according to the statement of the account filed by the Power Company, of $77.86, and this should be added to the $899.01, and

when added, makes a total of $976.87, and this we find to be the net value of the engine at the time of its conversion, and the judgment will be modified by increasing it from $840 to $976.87.

This is less than the value of the engine as contended by the mortgagee, but more than its value as contended by the Power Company.

On behalf of the plaintiff mortgagee, Langham testified that the value of the engine after the first repairs was $5,600, but the testimony does not sustain that contention. The price of the engine new was $6,600 in 1920, but twelve months later the selling price of the same engine had been reduced to $5,600, so that if, after the first repairs, the engine was as good as new, as Langham contends, its value did not exceed $5,600, but the testimony clearly shows that it did not have the value of a new engine. Its capacity had been reduced from 100 to 80 H. P., and all of its old parts had been subjected to five years' use, and all the testimony is to the effect that the value of engines depreciates rapidly with use, and that the average life of similar engines is only ten years. The engine was, of course, a second-hand one after it was repaired in 1925, notwithstanding its new parts. It was also shown that several new models had been placed on the market since 1920 and that this fact affected the price of the older models.

There was testimony on the part of the Power Company that before the engine was rebuilt and restored to 100 H. P., its only value was junk, amounting to about $200. The testimony which we have recited shows that this estimate was too low.

The Power Company insists that the above statement, which we have approved in determining the value of the engine, allows nothing for factory profits, but as it was a wrongdoer in converting the engine it is entitled to no profit.

The Power Company also insists that this statement takes no account of the two notes evidencing the amount

378

due for the repairs after the fire, which were made in 1925, and that if this were done it would owe nothing. But, as we have said, no action was taken to enforce a lien against the engine, and we cannot now, in effect, enforce this lien by taking this item into account. Besides, the repairs, subject to the use they had undergone, were on the engine at the time of its conversion and gave it, in part at least, the value it then had. It was the repaired engine which the Power Company converted.

It is true the fact to be adjudged is the value of the engine at the time and place of its conversion, and it is for this amount only that judgment should be rendered, but we think the testimony which we have recited shows its value to be the sum found by us, to-wit, $976.87.

The Power Company calls attention to the fact that in making the sale of the engine it took in exchange two other second-hand engines at a price of $600 each, and that these two engines have not yet been sold. But there was no showing that they were not worth their trade-in value, nor that they will not be sold without loss when they have been rebuilt.

The judgment in favor of appellant will therefore be modified by increasing it from $840 to $976.87, and, as thus modified, it will be affirmed.